**ESTATE of Richard BURKS, Lucille Burks, Administratrix, Plaintiff-Appellant,**

v.

**Dr. Leon ROSS, Dr. Rosalie Ging, C. Dozauer, J. Treado, R. Rosendall, J. Stigail, Oliver B. Coleman, James Hampton and Robert Fletcher, Defendants-Appellees.**

**No. 20261.**

United States Court of Appeals, Sixth Circuit.

Feb. 18, 1971.

See also 6 Cir., 418 F.2d 913.

Virginia C. Dare, Detroit, Mich., for appellant.

Thomas J. Press, Department of Justice, Washington, D. C., William D. Ruckelshaus, Asst. Atty. Gen., Robert V. Zener, Atty., Department of Justice, Washington, D. C., Robert J. Grace, U. S. Atty., Detroit, Mich., on the brief, for appellees.

Before WEICK, EDWARDS and McCREE, Circuit Judges.

WEICK, Circuit Judge.

This appeal is from an order of the District Court granting summary judgment in favor of the defendants, in an action for damages for wrongful death of plaintiff's decedent, against nine members of the staff of the Veterans Administration Hospital in Ann Arbor, Michigan, where the decedent had been confined as a mental patient in a locked ward. It was alleged that the Director and Administrator of the hospital, Dr. Leon Ross, the Director of Neuropsychiatry, Dr. Rosalie Ging, nurses J. Treado, R. Rosendall, J. Stigail and C. Dozauer, and psychiatric nurses' assistants Oliver B. Coleman, James Hampton and Robert Fletcher, all of whom are federal employees, were negligent in the custodial care of the decedent, as a result of which negligence he escaped from the hospital and was struck and killed by a train of the New York Central Railroad.

The District Judge, in granting summary judgment, held that the federal employees had absolute immunity from suit under the doctrine sometimes referred to as executive privilege and upheld in Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), and its companion case, Howard v. Lyons, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959).[1]

---

1. We would not be concerned with the difficult questions of immunity as applied to the Director and Administrator of the hospital, the Director of Neuropsychiatry, the nurses and their assistants, if the plaintiff had filed suit against the United States under the Federal Tort Claims Act, 28 U.S.C. § 2674, which provided her with an adequate remedy. In factually similar cases, recovery was allowed against the government. White v. United States, 317 F.2d 13 (4 Cir. 1963). The trouble is that plaintiff did not file an action against the government within the two year period of limitation provided in 28 U.S.C. § 2401(b) and her claim was barred before she filed the present case. Congress has since passed legislation making the remedy against the government exclusive of any claim against an employee of the Department of Medicine and Surgery of the Veterans Administration, who may no longer be held liable. 38 U.S.C. § 4116(a) (Supp.1970). Since the present suit was filed before the statute was enacted, it is inapplicable. The

Decedent was committed as a mentally ill person by the Probate Court of Genessee County, Michigan. The court psychiatrists diagnosed him as overly depressed, psychotic, suicidal, and a potential danger to himself. A few days after his commitment he was transferred to the Veterans Administration Hospital at Ann Arbor, as a closed ward patient, which meant that he was not allowed to go from the ward without special permission and without supervision. Dr. Ging, who was the admitting physician, gave instructions that he should be involved in activities such as occupational therapy, group therapy, and recreational therapy.

One afternoon at about 3:00 p. m., the decedent was taken with a group of patients to see movies in the hospital auditorium. During the showing he disappeared and was not missed until around 4:30 to 5:00 p. m. At about 7:30 p. m. he was found lying near the tracks of the New York Central Railroad; he died two days later from his injuries.

The duties of the hospital staff were outlined in the affidavit of Dr. Arthur J. Klippen, Director of Hospitals, Department of Medicine and Surgery, Veterans Administration Central Office in Washington D.C. as follows:

"4. That Dr. Leon Ross was director and administrator of this hospital on August 11, 1961, and as such had the duty to generally manage the hospital and to be ultimately responsible for the distribution of personnel throughout the hospital, to alter internal hospital procedures, work flow and methods of operation if deemed necessary, and to change organization flow at the professional service level if also deemed necessary by him for the purpose of improving service.

"5. That as a Psychiatrist at this hospital Dr. Rosalie Ging had the duty to diagnose, care and treat the veteran Richard C. Burks while a patient at this hospital, and the duty to prescribe and communicate instructions relative to the care of Mr. Burks to the nurses in attendance upon him either in writing or orally.

"6. That the hospital records show the defendants C. Dozauer, J. Treado and J. Stigail were on August 11, 1961, nurses assigned to the Psychiatric Unit at this hospital; that their duties included nursing care including executing the orders and instructions given by the doctor, keeping patients under observation, maintaining adequate safeguards and precautions for the patients' safety, advising their nursing superior and doctors of the patients' condition and behavior, and generally supervising and giving instructions to the psychiatric aides on duty during their duty hours.

"7. That the records of this hospital show that Oliver B. Coleman, James Hampton and Robert W. Fletcher were Psychiatric Nursing Assistants on August 11, 1961, and as such assigned to the closed ward. On the aforesaid date their duties including making, reporting and recording observations of patients' behavior, initiating, supervising and participating in scheduling patient activities, maintaining safety precautions, supervising patients in personal hygiene, encouraging ward and off-ward activities of the patients, carrying out nursing procedures and interacting with the patients in the closed ward group to promote the most comfortable therapeutic atmosphere for those patients."

Barr v. Matteo, relied on by the District Judge, was a libel action against the Acting Director of the Office of Rent Stabilization, brought by former employees of the office who alleged that they were damaged by a press release issued by the Director.

In the majority opinion, written by Mr. Justice Harlan, the court referred to the fact that the law of privilege as a defense to civil damage suits for defama-

statute grants legislative immunity to these government employees. Barr v. Matteo, *supra*, involved immunity granted by the courts to all government officials.

tion, was largely of judicial making,[2] although the Constitution gave an absolute privilege to members of Congress.

The reasons for the privilege were stated by Justice Harlan:

"The reasons for the recognition of the privilege have been often stated. It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government. The matter has been admirably expressed by Judge Learned Hand:

" 'It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. * * *

'The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him. * * * ' Gregoire v. Biddle, 2 Cir., 177 F.2d 579, 581.

"We do not think that the principle announced in *Vilas* can properly be restricted to executive officers of cabinet rank, and in fact it never has been so restricted by the lower federal courts.[3] The privilege is not a badge or emolument of exalted of-

2. Spalding v. Vilas, 161 U.S. 483, , 16 S.Ct. 631, 40 L.Ed. 780 (1896) (Postmaster General) ; Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1871) (Judges) ; Yaselli v. Goff, 12 F. 2d 396 (2d Cir. 1926), aff'd, 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927) (Special Assistant to Attorney General.)

3. "As to suits for defamation see, e. g., Taylor v. Glotfelty, 6 Cir., 201 F.2d 51;

fice, but an expression of a policy designed to aid in the effective functioning of government. The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy." (Footnotes omitted) Barr v. Matteo, 360 U.S. at 571–573, 79 S.Ct. at 1339.

It is the protection of executive discretion which must support any claim of official privilege in the present case.

Discretion is not a concept which has easily lent itself to precise definition; however, it is a concept with which the federal courts have had much experience. The concern for protecting discretion is found not only in the absolute executive privilege from tort liability, but also in actions for mandamus and in the "discretionary function" exemption to the Federal Tort Claims Act, 28 U.S.C. § 2680(a). As observed in Dalehite v. United States, 346 U.S. 15 at 35–36, 73 S.Ct. 956 at 968, 97 L.Ed. 1427:

> "It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discre-

tion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable." [Footnote omitted.]

Appellant urges that "discretion" means the same thing in the context of the executive privilege as it does under the Tort Claims Act, where the government has been held liable for negligence in the treatment or custodial care of patients. Brown v. United States, 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954); Underwood v. United States, 356 F.2d 92 (5th Cir. 1966) (negligent release of psychiatric patient with homicidal tendencies); White v. United States, 317 F.2d 13 (4th Cir. 1963) (psychiatric patient allegedly escaped through negligence of staff, and was killed when struck by train); Fair v. United States, 234 F.2d 288 (5th Cir. 1956) (negligent release from hospital of psychiatric patient with homicidal tendencies); Friedland v. United States, 209 F.Supp. 684 (D.Mass.1962) (negligent care of schizophrenic patient who died from self-inflicted wound).

We cannot agree that "discretion" can be read so narrowly as it is now under the Federal Tort Claims Act, which has been liberally interpreted to provide a remedy against the government. White v. United States, *supra*, 317 F.2d at 16. The Act's liberal construction ought not to be extended to limit the immunity of federal employees. Liability of the government itself for wrongs committed by its employees will not have the same inhibiting effect on governmental operations as the personal liability of an official. The Tort Claims Act seeks to bar only those suits where the "discretion" is that involved in the formation of policy, rather than in its operation.[4]

Smith v. O'Brien, 66 App.D.C. 387, 88 F.2d 769; De Arnaud v. Ainsworth, 24 App.D.C. 167, 5 L.R.A.,N.S., 163; Farr v. Valentine, 38 App.D.C. 413; United States, to Use of Parravicino, v. Brunswick, 63 App.D.C. 65, 69 F.2d 383; Carson v. Behlen, D.C., 136 F.Supp. 222; Tinkoff v. Campbell, D.C., 86 F.Supp. 331; Miles v. McGrath, D.C., 4 F.Supp. 603. See also, as to other torts, Jones v.

Kennedy, 73 App.D.C. 292, 121 F.2d 40; Adams v. Home Owners' Loan Corp., 8 Cir., 107 F.2d 139; Gregoire v. Biddle, *supra;* De Busk v. Harvin, 5 Cir., 212 F.2d 143; Lang v. Wood, 67 App. D.C. 287, 92 F.2d 211." [Footnote renumbered]

4. Rayonier, Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354

The executive privilege does not apply, however, where the conduct is outside the employee's scope of authority. In Barr v. Matteo, the Court held that the press release being—

> " * * *. within the outer perimeter of petitioner's line of duty is enough to render the privilege applicable, despite the allegations of malice in the complaint. * * * " [5] 360 U.S. at 575, 79 S.Ct. at 1341.

It is contended by the appellant that the staff did not prevent the escape of the patient, and that in failing to do so it acted outside the line of its duties. Appellant further contended that Michigan law should control the meaning of "line of duty," or what she characterizes as "scope of employment." These contentions are without merit.

First, federal law controls the meaning of "scope of employment" in this case. The question of authority is relevant to a federally shaped privilege protecting federal employees as a matter of federal law. It has been clearly held in Howard v. Lyons, 360 U.S. 593, 594, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959), the companion case to Barr v. Matteo, that federal law therefore controls on the question of authority. 360 U.S. at 597, 79 S.Ct. 1331. Second, there is no proof that any staff member acted outside the scope of his employment.

It was also the theory of the appellant that Doctors Ross and Ging were liable for the negligence of their subordinates, the nurses and nurses' assistants. This contention is likewise untenable. The nurses and their assistants were not employees of Doctors Ross and Ging, but employees of the United States. The government, and not the doctors, could be held liable only for their negligence on the principle of respondeat superior.[6] Cf. David v. Cohen, 132 U.S. App.D.C. 333, 407 F.2d 1268, 1271 (1969).

Thus, we are left to the application of executive privilege to the present case. It is clear that Doctors Ross and Ging are entitled to absolute immunity. Doctor Ross was the Director and Administrator of the hospital, in the operation of which he was necessarily vested with wide discretion.

While Doctor Ging had less discretion, nevertheless in her diagnoses and treatment of patients and in her supervisory powers over other employees she was vested with discretion. She is entitled to immunity from suit. Garner v. Rathburn, 346 F.2d 55 (10th Cir. 1965); Blitz v. Boog, 328 F.2d 596 (2d Cir. 1964); Taylor v. Glotfelty, 201 F.2d 51 (6th Cir. 1952); Gamage v. Peal, 217 F.Supp. 384 (N.D.Calif.1962).

The nurses and their assistants, however, had few discretionary duties, but performed largely ministerial functions under the supervision and orders of their superiors. We conclude that the executive privilege does not extend to them. The District Court ruled only on the question of immunity and did not consider the issue of negligence as applied to the nurses and their assistants. However, it would appear from the affidavit of Dr. Klippen that the duties of the nurses included—

> " * * * keeping patients under observation, maintaining adequate safeguards and precautions for the patients' safety, * * * and generally supervising and giving instructions to

(1957): Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955).

5. While Barr v. Matteo was an action for defamation, the Court recognized in footnote 9 that the doctrine of executive immunity applied to other torts.

6. The one negligent act alleged against Dr. Ross, that he hired incompetent personnel, not only involves discretion, but does not even state a cause of action under Michigan law, since no intentional tort is alleged. Dehtiar v. Mietkowski, 372 Mich. 527, 530–531, 127 N.W.2d 388 (1964); Bradley v. Stevens, 329 Mich. 556, 46 N.W.2d 382 (1951); Hersh v. Kentfield Builders, 19 Mich. App. 43, 172 N.W.2d 56 (1969).

the psychiatric aides on duty during their duty hours."

The psychiatric nursing assistants, all of whom were men, had duties, among others, of—

" * * * supervising and participating in scheduling patient activities, maintaining safety precautions, supervising patients in personal hygiene, encouraging ward and off-ward activities of the patients, carrying out nursing procedures and interacting with the patients in the closed ward. * * "

The question of whether any of the nurses or their assistants violated any duty owed to the decedent, which violation proximately caused his death, will have to be determined by the District Court on the remand. In our opinion each nurse and assistant would be liable only for his own negligence and not for the negligence of any other nurse or assistant.

The judgment of the District Court is affirmed with respect to Doctors Ross and Ging. It is reversed as to the nurses, C. Dozauer, J. Treado, R. Rosendall, and J. Stigail, and their assistants, Oliver B. Coleman, James Hampton and Robert Fletcher, and the case is remanded for further proceedings consistent with this opinion.