Paul Frederick LENEA,
Plaintiff–Appellee,
Cross–Appellant,

v.

Michael P. LANE, et al.,
Defendants–Appellants,
Cross–Appellees.

Nos. 88–1653, 88–1734, 88–2407
and 88–2436.

United States Court of Appeals,
Seventh Circuit.

Argued March 28, 1989.

Decided Aug. 11, 1989.

Thomas J. Canna and John F. Canna, Canna & Canna, Homewood, Ill., for Paul F. Lenea, plaintiff-appellee, cross-appellant.

Neil F. Hartigan, Atty. Gen., Timothy J. Cavanagh, Deborah L. Ahlstrand, Bret A. Rappaport, and William H. London, Asst. Attys. Gen., Office of the Atty. Gen., Chicago, Ill., for Michael P. Lane, et al.

Before CUDAHY and MANION, Circuit Judges, and HENLEY, Senior Circuit Judge.[*]

MANION, Circuit Judge.

Plaintiff-appellant Paul Lenea is an inmate in the Stateville Correctional Center in Joliet, Illinois. A prison disciplinary committee and the Department of Corrections Director found him guilty of aiding and abetting an escape. He was placed in segregation for 360 days, had 360 days of good time credits revoked, and was demoted to grade "C" for 360 days. Lenea sued the Illinois Department of Corrections and its Director, Michael Lane, among others, under 42 U.S.C. § 1983, claiming defendants[1] denied him due process by finding him guilty without sufficient evidence. The district court agreed, and ordered the disciplinary action expunged from Lenea's record. We affirm.

### I.

On December 31, 1982, two Stateville inmates, Randy Valleff and Patrick Cecconi, went over the wall. The day before, Valleff and Cecconi had obtained bogus chapel passes from a chapel clerk (Lenea's co-worker), permitting them to visit the prison chapel on December 31. According to Valleff (after his apprehension, he provided details of the escape; the report containing those details is part of the record on appeal), he and Cecconi (together with another inmate, Frank Amato, who was part of the plan), visited the chapel on the 31st and left around 2:30 p.m. After that they hid out in a manhole until 6:30 p.m. Sometime between 6:30 and 9:30 p.m., they escaped. (Amato tried, but did not make it.)

During the ensuing investigation Lenea, like several other inmates, was asked to submit to a polygraph test. He agreed; and the results showed he had answered two questions deceptively[2] (whether he helped or planned the escape and whether he knew of the escape plans before December 31). On the strength of those results, Lenea was charged with aiding and abetting the escape, and with providing false information to prison officials.

The Institutional Adjustment Committee ("IAC") held a hearing at which Lenea appeared and testified. The IAC found Lenea "guilty as charged," reciting evidence which showed that Lenea knew Valleff (as a prison barber) and Cecconi (who visited the chapel frequently), that Lenea saw Valleff in the chapel on December 31, and that Valleff asked Lenea for a cigarette light and to use a chapel room that day. The IAC concluded:

[T]he investigation report indicates that Res. Lenea was asked 2 direct questions pertaining to his involvement in the escape incident which occurred on December 31, 1982. The polygraph test indicated that the inmate answered untruthful to both questions. Therefore, the [IAC] reasonably feels the inmate [Lenea] was guilty as charged.[3]

---

[*] The Honorable J. Smith Henley, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

[1.] For ease of reference, we will refer to all defendants-appellants, cross-appellees, simply as "defendants."

[2.] The results also showed no indication of deception when Lenea denied helping, planning or knowing of a subsequent escape attempt involving inmate Perruquet. For details on Perruquet's effort, see Viens v. Daniels, 871 F.2d 1328 (7th Cir.1989).

[3.] The IAC also found Lenea guilty of providing false information to prison officials. But on review, both the (full) Administrative Review Board and the Director disagreed; thus, that charge is not at issue here.

The Department of Corrections' Administrative Review Board reviewed the IAC's decision. The Board interviewed Lenea and Stateville personnel, and reviewed Lenea's master file. A majority of the Board voted to overturn the disciplinary report, explaining that it was "their belief that the results of a polygraph examination are insufficient evidence for a finding of guilt." A minority disagreed, and recommended that the punishment be upheld. The minority reasoned that "[i]n consideration of the seriousness of the attempted offense and the results of the polygraph examination indicating Mr. Lenea was untruthful the undersigned is reasonably satisfied that Mr. Lenea committed the [aiding and abetting] violation for which he was cited and that the disciplinary action was appropriate." Director Lane adopted the minority's position without comment.

Lenea moved for summary judgment on February 21, 1986, contending that polygraph results were inadmissible in prison disciplinary hearings, and that without the results, there was not sufficient evidence to support the finding of guilt. Judge Leighton denied the motion, holding that polygraph results were admissible, and that, based on the record, the court could "not conclude there was not 'some evidence' to support the decision of the disciplinary committee." Defendants then moved for summary judgment on January 7, 1987, arguing there was "some evidence" to support the finding of guilt. Judge Leighton denied this motion too, holding that issues of fact still remained on the question of whether "some evidence" existed.

The case was reassigned to Judge Plunkett in December 1987, who treated the parties' earlier (denied) motions as cross-motions for summary judgment, and held that Lenea was denied due process because there was not "some evidence" of his guilt. The court rejected the so-called circumstantial evidence of Lenea's guilt consisting of (1) Lenea's presence in the chapel on the day of the escape, (2) Lenea's admission that he knew Valleff and Cecconi, and (3) material contained in his master file, explaining that it was not evidence of guilt at all. Thus, only the polygraph results remained. But according to the district court, the test results showed only that Lenea had been deceptive when he denied knowing of, or assisting in the escape; thus, they were relevant only on the question of Lenea's credibility, not as to the substantive offense charged. Concluding that the polygraph test results alone were insufficient to constitute "some evidence" of Lenea's guilt, the district court held Lenea was denied due process and ordered that the disciplinary action against Lenea be expunged from his record. Defendants moved to vacate the order on qualified immunity grounds. The district court agreed that defendants were personally immune from damages, finding that "the right not to be found guilty at a prison disciplinary proceeding solely on the basis of a failed lie detector test" was not clearly established in 1983. (This, though, did not change the court's earlier order to the extent it ordered Lenea's record expunged.)

Both sides appeal. Defendants argue that (1) the polygraph results coupled with the other circumstantial evidence, amounted to "some evidence" of Lenea's guilt; and (2) Lenea's suit sounded in habeas corpus, and thus should have been dismissed for his failure to exhaust state remedies.[4] Lenea contends that (1) polygraph test results are inadmissible in prison disciplinary proceedings; (2) defendants are not entitled to qualified immunity; and (3) even if defendants are qualifiedly immune, qualified immunity does not bar reinstatement or backpay.

## II.

A. Admissibility of Polygraph Test Results.

■ It is well-settled that prison disciplinary proceedings "are sui generis, gov-

4. At oral argument, defendants candidly conceded that this case (on the habeas/exhaustion issue) would be controlled by the outcome of a case previously argued, but undecided as of that date. The following day, this court issued its opinion in *Viens v. Daniels*, 871 F.2d 1328 (7th Cir.1989), which forecloses defendants' habeas/exhaustion arguments. In any event, we agree with the district court that defendants have waived this argument because they failed to raise it until after the district court entered judgment.

erned by neither the evidentiary rules of a civil trial, a criminal trial, nor an administrative hearing." J. Gobert, N. Cohen, *Rights of Prisoners,* § 8.07, p. 243 (1981). They take place "in a closed, tightly controlled environment peopled by those who have chosen to violate the law and who have been lawfully incarcerated for doing so." *Wolff v. McDonnell,* 418 U.S. 539, 561, 94 S.Ct. 2963, 2977, 41 L.Ed.2d 935 (1974); *see also Ponte v. Real,* 471 U.S. 491, 495, 105 S.Ct. 2192, 2195, 85 L.Ed.2d 553 (1985). For that reason we do not "automatically apply procedural rules designed for free citizens in an open society ... to the very different situation presented by a disciplinary proceeding in a state prison." *Wolff v. McDonnell,* 418 U.S. at 560, 94 S.Ct. at 2977. Additionally, prisoners' due process rights are "circumscribed by the necessary 'mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.'" *Baxter v. Palmigiano,* 425 U.S. 308, 321, 96 S.Ct. 1551, 1559, 47 L.Ed.2d 810 (1976) (quoting *Wolff v. McDonnell,* 418 U.S. at 556, 94 S.Ct. at 2974). Prisoners, for example, have no absolute right of confrontation or to conduct cross-examination at prison disciplinary hearings. *Baxter,* 425 U.S. at 322, 96 S.Ct. at 1559. And adverse inferences may be drawn from an inmate's silence at a disciplinary hearing, even though unquestionably that would be prohibited in a criminal trial. *Id.* at 319–20, 96 S.Ct. at 1558–59. Accordingly, whether polygraph test results are admissible here must be decided within the unique context of prison disciplinary proceedings, and not by reference to rules or constitutional guarantees applicable to ordinary civil or criminal disputes.

We are fully cognizant of the debate surrounding the polygraph's acceptance and reliability, and of the fact that some courts and administrative tribunals prohibit the admission of polygraph results. *See, e.g., Brown v. Darcy,* 783 F.2d 1389, 1395 (9th Cir.1986) (Ninth Circuit overruled prior decisions vesting polygraph admissibility

questions in trial court's discretion in light of, among other things, the "questionable reliability" of polygraph evidence); *Dowd v. Calabrese,* 585 F.Supp. 430, 432–34 (D.D.C.1984) (polygraphs lack scientific acceptability); *Kaske v. City of Rockford,* 96 Ill.2d 298, 70 Ill.Dec. 841, 450 N.E.2d 314 (polygraph results held inadmissible in administrative hearings), *cert. denied,* 464 U.S. 960, 104 S.Ct. 391, 78 L.Ed.2d 335 (1983). But not all courts take this view, and their exclusion is not universal. *See, e.g., United States v. Rumell,* 642 F.2d 213, 215 (7th Cir.1981). *See also McCormick on Evidence,* § 2.06, p. 629 (3d ed.1984). Indeed, in prison disciplinary hearings, polygraph results are routinely admitted and relied upon. *See Viens v. Daniels,* 871 F.2d at 1335; *Zimmerlee v. Keeney,* 831 F.2d 183, 187 (9th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 2851, 101 L.Ed.2d 888 (1988); *Cato v. Rushen,* 824 F.2d 703, 705 (9th Cir.1987); *Varnson v. Satran,* 368 N.W.2d 533 (N.D.1985); *Bucklin v. State,* 342 N.W.2d 896 (Iowa Ct.App.1983). In prison disciplinary hearings, polygraphs may corroborate vital testimony or other evidence. *Viens v. Daniels, supra; Varnson, supra.* They may even provide a prisoner with exculpatory evidence. We note here that Lenea apparently was a beneficiary of the polygraph in connection with the investigation of inmate Perruquet's attempted escape (*see supra* n. 2).

In light of the prison disciplinary hearing's unique setting and the general acceptance of polygraph evidence in such cases, we decline to adopt a blanket prohibition on the admission of polygraph results, and now expressly hold that polygraph test results are admissible in prison disciplinary proceedings. As the district court noted, a prison's need to maintain institutional security, to avoid burdensome administrative requirements that might be susceptible to manipulation, and to preserve the disciplinary process as a means of rehabilitation, all militate in favor of this court's deference to the disciplinary committee's decision to admit the results of polygraph exams.[5]

5. Anticipating this result, Lenea also argued to     this court that the record "suggest[ed]" he did

### B. Whether There Was "Some Evidence" of Lenea's Guilt?

Prison disciplinary board conclusions must be supported by "some evidence." *Superintendent v. Hill,* 472 U.S. 445, 454–56, 105 S.Ct. 2768, 2773–74, 86 L.Ed.2d 356 (1985); *Viens v. Daniels,* 871 F.2d at 1334. This "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Superintendent v. Hill,* 472 U.S. at 455–56, 105 S.Ct. at 2773–74.

Although "some evidence" is not much, and obviously ranks far below what would be sufficient in a criminal or civil trial, it still must point to the accused's guilt. In *Viens v. Daniels,* for example, inmate Perruquet was found guilty of an escape attempt based on an informant's statements implicating Perruquet, a polygraph examination corroborating the informant's statements, and testimony from Perruquet's treating physician tending to discredit Perruquet's defense. 871 F.2d at 1335. *Freitas v. Auger,* 837 F.2d 806 (8th Cir.1988), also involved inmate disciplinary action for conspiring to aid in an escape. "Some evidence" of the charged inmate's guilt was held to exist based on the inmate's admitted conversations with the escapees regarding the escape, his knowledge of the escape plans, and confidential informants' statements directly implicating the inmate. *Id.* at 811–12. The evidence in both of these cases, while not overwhelming, was sufficiently reliable, and adequately supported a finding of guilt.

Here defendants argue "some evidence" exists of Lenea's guilt, pointing to (1) Lenea's presence in the prison chapel on the day of the escape; (2) Lenea's admission that he knew the escapees; (3) (unidentified and nonrecord) material contained in Lenea's master file; and (4) the results of Lenea's polygraph test.[6] We disagree. As the district court aptly explained:

> The temptation is to conclude, as did the Department of Corrections, that these facts constitute some evidence of guilt. However, a closer examination of these "facts" demonstrates that only the polygraph test could arguably be evidence of guilt. Plaintiff was shown to be in the chapel at the time Valleff and Cecconi escaped from there,[7] but it is clear that Plaintiff was in the chapel because that was his work assignment. Plaintiff's admission that he knew both escapees is only marginally relevant since both had visited the chapel on earlier occasions. Further, it is hardly incriminating for one prisoner to admit he knows another. We have also reviewed Plaintiff's master file and find nothing which supports the conclusion that Plaintiff aided the escape. The State points to nothing from this file that might be construed as some evidence of guilt. In short, all that this "evidence" demonstrates is that Plaintiff was properly present in the chapel when the two escapees were last seen by prison officials. If this "evidence" proves anything, it proves only that Plaintiff had the *opportunity* to aid an escape. It

---

not voluntarily take the polygraph test, in an effort to bar the exam's admission at least in this case. We are not persuaded. The Administrative Review Board's minority report—which Director Lane adopted—specifically concludes, on the strength of Lenea's signed waiver, that he voluntarily submitted to the test. We see no reason to disturb this finding.

**6.** Lenea contends that the only evidence relied upon to support the disciplinary action was his polygraph exam. We agree that this was the only "evidence;" however, we also believe defendants did rely (wrongly, it turns out) on the other circumstantial information listed above. While defendants' disciplinary reports cite only the polygraph exam, read as a whole, *Redding v. Fairman,* 717 F.2d 1105, 1115 (7th Cir.1983), cert. denied, 465 U.S. 1025, 104 S.Ct. 1282, 79 L.Ed.2d 685 (1984), the discipline reports do indicate that the other information was relied on as well, however wrong it was to do so.

**7.** It is not clear that Valleff and Cecconi escaped from the chapel. Valleff's unrebutted and apparently unquestioned version of the escape is that after leaving the chapel, Valleff, Cecconi, and Amato hid out in a manhole for four hours before Valleff and Cecconi climbed over the prison wall. This makes the chapel's (and hence Lenea's) connection to the escape even more attenuated.

is not even a modicum of evidence that he did so. (Emphasis in original.) [8]

Indeed, we strongly doubt whether these facts even amount to evidence of an opportunity to aid the escape (*see supra* n. 7). And in no sense is this evidence comparable to that in *Superintendent v. Hill.* There a guard heard an assault occurring in a prison walkway. Upon entering the walkway, he saw an injured prisoner and three inmates running from the scene. Although hardly convincing beyond a reasonable doubt, this evidence did tend to show that one of the fleeing inmates committed the assault. By contrast, Lenea was not shown to be in the area of the escape, nor was he otherwise shown to be the only inmate with an opportunity to aid the escape. *Compare Superintendent v. Hill.* The "evidence" here falls short of even the minimal evidence necessary under *Superintendent v. Hill.*

The question thus becomes whether the polygraph exam alone could be "some evidence" of Lenea's guilt. Defendants, however, did not argue that it could be; instead, they insisted here, as they did in the district court, that other evidence of Lenea's guilt (Lenea's presence in the chapel, etc.) existed besides the polygraph exam. But as we have seen, this was not the case. Thus, the district court's conclusion that the polygraph results alone were the only evidence of guilt relied upon, and that those results were insufficient to support a finding of guilt, goes unchallenged; and without challenge, it stands unchanged. At any rate, in this case, we would agree with the district court that polygraph evidence was relevant only on the question of Lenea's credibility. Absent any other evidence pointing to Lenea's guilt, this simply was not enough to find him guilty of aiding and abetting the escape. We do not, however, decide whether

polygraph exams in all cases are insufficient by themselves to establish "some evidence." But while we don't decide the issue, we do note that the threshold question (when the issue is properly before the court) will be the exam's reliability, *Viens v. Daniels,* 871 F.2d at 1335 (evidence relied upon by disciplinary board "must bear sufficient indicia of reliability"), which necessarily will entail a detailed inquiry into polygraph examinations. *Cf. Peranzo v. Coughlin,* 675 F.Supp. 102, 105 (S.D. N.Y. 1987), *aff'd per curiam,* 850 F.2d 125 (2d Cir.1988) (court held drug-testing method employed by New York's Department of Corrections which had a 98+ percent accuracy rate was "sufficiently reliable so that the use of the results as evidence, even as the only evidence, in a disciplinary hearing does not offend due process").

## C. Relief.

Lenea sought compensatory and punitive damages, expunction of his record (regarding the disciplinary action), reinstatement to his chapel job, and backpay. The district court ordered that Lenea's record be expunged, but denied all other relief except attorneys' fees.[9] The court held that defendants were personally immune from damages and that the Eleventh Amendment barred any monetary relief against the Department of Corrections (the latter ruling is not contested on appeal).

We agree that defendants enjoy the protection of qualified immunity. "The doctrine of qualified immunity shields government officials performing discretionary functions from liability for civil damages." *Conner v. Reinhard,* 847 F.2d 384, 387 (7th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 147, 102 L.Ed.2d 118 (1988). While an award of damages may vindicate a violation of one's constitutional rights, courts must "protect against the danger

---

**8.** The district court's conclusion (regarding what evidence was relied upon) is consistent with the Administrative Review Board's—both the majority and minority versions. In recommending that the charges against Lenea be dropped, the majority hinged its decision on its belief that the polygraph exam *alone* was insufficient evidence for a finding of guilt. Likewise, the minority relied on "the seriousness of the

attempted offense and the results of the polygraph examination...."

**9.** Because we uphold the district court's judgment, and because defendants do not contest the fee award in the event of an adverse appellate decision, the fee award remains intact.

that the fear of being sued will hamper officials in the proper discharge of their duties." *Id.* But qualified immunity is available only if the official's conduct did not violate "clearly established constitutional rights of which a reasonable person would have known." *Id.* at 387–88; *see also Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

Lenea has the burden of demonstrating that defendants violated a constitutional right that was clearly established in early 1983. *Conner,* 847 F.2d at 388. As the Supreme Court explained:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official is protected by qualified immunity unless the very action in question has previously been held unlawful [citation omitted]; but it is to say that in the light of preexisting law the unlawfulness should be apparent [citations omitted].

*Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). In *Conner,* we added:

> As this circuit has held: " 'The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful.' ... Our conclusion is that the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted." *Colaizzi v. Walker,* 812 F.2d 304, 308 (7th Cir.1987) (quoting *Azeez v. Fairman,* 795 F.2d 1296, 1301 (7th Cir.1986)). We have repeatedly recognized the inherent difficulties in either characterizing the right too generally, *see, e.g., Azeez,* 795 F.2d at 1301, or describing the fact situation with such detail that each case becomes unique, *see, e.g., Wade v. Hegner,* 804 F.2d [67] at 71 [ [ (7th Cir.1986) ]. To overcome these problems, we have " 'required caselaw which clearly and consistently recognized the constitutional right.' " *Lojuk v. Johnson,* 770 F.2d 619, 628 (7th Cir.1985) (quoting *Coleman v. Frantz,* 754 F.2d 719, 730 n. 15 (7th

Cir.1985)), *cert. denied,* 474 U.S. 1067, 106 S.Ct. 822, 88 L.Ed.2d 795 (1986). Although we do not require cases involving the exact fact pattern at bar, case law in a closely analogous area is essential to permit us to conclude that the constitutional right was clearly established at the time of the alleged violation. *Lojuk,* 770 F.2d at 628; *Benson v. Allphin,* 786 F.2d 268, 276 (7th Cir.1986) ("whenever a balancing of interests is required, the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability under ... *Harlow*"), *cert. denied,* [479] U.S. [848], 107 S.Ct. 172, 93 L.Ed.2d 109 (1987) (the Court denied two petitions for certiorari, Nos. 86–27 & 86–29).

847 F.2d at 388.

As the district court recognized, to define the right broadly, for example, the right not to be found guilty in a prison disciplinary proceeding unless there is "some evidence" of guilt, is to deny defendants immunity because that right was "clearly established" by 1983. (While *Superintendent v. Hill* was not decided until 1985, its result was compelled by the Court's earlier decisions. *See, e.g., Wolff v. McDonnell, supra.*) But phrasing the right so broadly would be contrary to *Anderson's* instruction. In *Anderson,* suit was brought against an FBI agent for damages resulting from a warrantless search of a home. The court of appeals described the right at issue as the right to be free from warrantless searches absent probable cause and exigent circumstances. The Supreme Court, however, rejected such a broad characterization of the right. The Court explained that:

> The operation of [the clearly established] standard ... depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right.

Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow.*

*Id.* 107 S.Ct. at 3038–39. Ignoring the particular action at issue and the specific facts of the case at hand in favor of a standard which simply alleged a "violation of extremely abstract rights" would, the Court recognized, "convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability." *Id.* at 3039. This "would destroy 'the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties,' by making it impossible for officials 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'" *Id.* (quoting *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984)). Thus, in *Anderson,* the proper question was "the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed." *Id.* at 3040.

It follows from all this that the proper question here is whether, in 1983, defendants should have known that relying solely on the results of a failed polygraph exam to establish a prisoner's guilt in committing a disciplinary offense was probably unlawful. The answer is no. To our knowledge, the district court in this case is the first to have decided that it would be unlawful. Indeed, by 1983 there had not been even a "closely analogous" decision. True enough, *Varnson, supra,* decided in 1985, casts considerable doubt on whether polygraph exams alone can be considered "some evidence" of guilt in prison disciplinary proceedings, but it did not decide the issue and neither do we. Regardless, for obvious reasons, *Varnson* cannot be used to conclude that a reasonable official would

have known in 1983 that finding a prisoner guilty of a disciplinary offense solely on the basis of a failed polygraph violated that prisoner's constitutional rights. That polygraphs (occasionally) are held inadmissible in judicial and administrative proceedings does not change our conclusion. As discussed above, prison disciplinary proceedings differ considerably from judicial and administrative hearings, and what is acceptable in one is not necessarily acceptable in the other. *See Wolff,* 418 U.S. at 560–61, 94 S.Ct. at 2076–77; *see also Baxter,* 425 U.S. at 319–20, 96 S.Ct. at 1558–59. In 1983, defendants were operating in uncharted waters when it came to the permissible uses of polygraph exams in prison disciplinary proceedings. Accordingly, they are entitled to qualified immunity.

■ Nonetheless, Lenea argues he still may obtain equitable relief in the form of backpay and reinstatement. Lenea seeks backpay against the individual defendants in their individual capacities. But they have no power to pay his back wages. *Burt v. Board of Trustees,* 521 F.2d 1201, 1204 (4th Cir.1975). "If these sums should have been paid, they should have been paid by the State, not by [the defendants] in [their] individual capacit[ies]." *Dwyer v. Regan,* 777 F.2d 825, 836 (2d Cir.1985), *modified on other grounds,* 793 F.2d 457 (2d Cir.1986); *see also Shirley v. Chagrin Falls Exempted Villages School Board of Education,* 521 F.2d 1329, 1334 (6th Cir. 1975), *cert. denied,* 424 U.S. 913, 96 S.Ct. 1111, 47 L.Ed.2d 317 (1976). Lenea's claim is really one for a retroactive award of monetary relief which requires the payment of funds from the state's treasury. *Dwyer,* 777 F.2d at 836. That payment does not have merely an "ancillary" effect on the state's treasury; thus, backpay from the state is barred by the Eleventh Amendment. *See, e.g., Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979); *Edelman v. Jordan,* 415 U.S. 651, 677, 94 S.Ct. 1347, 1362, 39 L.Ed.2d 662 (1974); *Dwyer,* 777 F.2d at 836.

■ At any rate, the "backpay" which Lenea seeks from the individual defendants

is in the nature of damages, no matter what he calls it, *Shirley,* 521 F.2d at 1334, which is barred by their qualified immunity. Lenea tries to circumvent defendants' qualified immunity by arguing that backpay is more in the nature of equitable relief, and hence not barred by qualified immunity. But Lenea's semantic exercise ignores the purpose for qualified immunity: protection against personal monetary relief so that, among other things, a fear of the threat of personal liability will not deter citizens from holding public office; and avoiding a chilling effect on the exercise of the official's decision-making responsibilities. *See Anderson,* 107 S.Ct. at 3038; *Owen v. City of Independence,* 445 U.S. 622, 655, 100 S.Ct. 1398, 1417, 63 L.Ed.2d 673 (1980); *Clanton v. Orleans Parish School Board,* 649 F.2d 1084, 1101 n. 20 (5th Cir.1981). Regardless of what label is placed on the monetary relief which Lenea wants, "equitable" or "legal damages," it remains a personal monetary award out of the official's own pocket. *Clanton,* 649 F.2d at 1101 n. 20. *Cf. Edelman v. Jordan,* 415 U.S. at 666, 668, 94 S.Ct. at 1357, 1358. Thus, the rationale of the qualified immunity doctrine precludes this relief.[10] *See Clanton,* 649 F.2d at 1101 n. 20; *Paxman v. Campbell,* 612 F.2d 848, 856 (4th Cir.1980) (en banc), *cert. denied,* 449 U.S. 1129, 101 S.Ct. 951, 67 L.Ed.2d 117 (1981); *Shirley,* 521 F.2d at 1334.

We also do not think reinstatement is proper in this case. First, as a practical matter, the individual defendants cannot in their individual capacities reinstate Lenea to his chapel job. *Burt,* 521 F.2d at 1204. And even if reinstatement is permissible against the state as prospective injunctive relief under the Eleventh Amendment, *Quern v. Jordan,* 440 U.S. at 337, 99 S.Ct. at 1143, it is not mandatory. Granting equitable relief under § 1983 is within the district court's sound discretion; and its

decision will not be reversed absent an abuse of discretion. *See Peery v. Brakke,* 826 F.2d 740, 746–47 (8th Cir.1987); *Abeyta v. Town of Taos,* 499 F.2d 323, 328 (10th Cir.1974). "Under the abuse of discretion standard, the inquiry is not how the reviewing court would have ruled if it had been considering the case in the first place, but rather, whether any reasonable person could agree with the district court." *United States v. United States Currency in the Amount of $103,387.27,* 863 F.2d 555, 561 (7th Cir.1988).

Lenea does not argue there was an abuse of discretion; instead, he merely says "[t]his case is an appropriate one for ordering Defendants to reinstate Plaintiff...." We are not told why this is an "appropriate" case for reinstatement, or, more important, how the district court abused its discretion. Regardless, though, there was no such abuse here. The expunction of Lenea's record, as the district court ordered, sufficiently protects Lenea from future prejudice in obtaining work assignments and transfers, *Chapman v. Kleindienst,* 507 F.2d 1246, 1248–49 n. 2 (7th Cir.1974), and reflects a reasonable balancing of the equities and the parties' respective interests. *Redding v. Fairman,* 717 F.2d at 1119.

For the foregoing reasons, we affirm the district court.

A︎FFIRMED.

---

10. *Brown v. Bathke,* 566 F.2d 588, 593 (8th Cir. 1977), relied on by Lenea, is distinguishable. There, relief was awarded under 42 U.S.C. § 1983 against members of a school board in their *official* capacities, payable by the school district. The court declined to decide whether the board members acted in good faith, explaining that qualified immunity "applies only to damages, not to equitable relief." *Id.* But as the court's citation to *Owen v. City of Independence,* 560 F.2d 925 (8th Cir.1977), makes clear, the immunity at issue was the school district's, not the individual members' in their individual capacities. Here, of course, we are talking about the individual defendants' qualified immunity.