**James HYSON, Plaintiff,**

v.

**E. Calvin NEUBERT, et al., Defendants.**

**Civ. A. No. 92–4318 (JEI).**

United States District Court,
D. New Jersey.

May 3, 1993.

James Hyson, pro se.

Ronald L. Bollheimer, Deputy Atty. Gen., State of NJ, Trenton, NJ, for defendants.

## OPINION

IRENAS, District Judge:

Defendants move for summary judgment under *Fed.R.Civ.P.* 56(b) dismissing plaintiff's § 1983 complaint. This motion will be granted, although not for the reasons urged by the defendants.

When plaintiff was a prisoner at Bayside State Prison ("Bayside"), he was charged and found guilty of possessing a knife in violation of applicable prison regulations. He was found guilty at a disciplinary hearing on January 15, 1992, and sanctioned with fifteen days detention, three hundred sixty-five days administrative segregation and three hundred thirty days loss of commutation time.

After losing an administrative appeal to the superintendent of Bayside, plaintiff appealed further to William H. Fauver, Commissioner of the New Jersey Department of Corrections. As a result of this appeal, a lie detector test was administered, and on June 12, 1992, the guilty finding was reversed and all sanctions expunged, at which time plaintiff was restored to the general prison population.[1]

When this case started, there was some confusion as to whether New Jersey had restored the lost commutation time, but that issue now seems to be resolved in plaintiff's favor. Thus, the only issue in this action under 42 U.S.C. § 1983 is whether plaintiff is entitled to monetary damages against the defendants[2] because plaintiff spent five months in detention and administrative segregation as the result of disciplinary proceedings which are alleged to have violated his due process rights under the fourteenth amendment.

Because, as will hereafter be discussed, we cannot find at this stage in the proceedings that the original hearing comported with the minimal due process requirements of *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) and its numerous progeny,[3] the only issue to be decided on this motion for summary judgment is whether the plaintiff's success at an administrative level in reversing the results of the disciplinary hearing forecloses a § 1983 damage action for events which occurred before this success.

Although there are literally hundreds of cases dealing with the constitutional requirements of prison disciplinary proceedings, these cases almost invariable are brought when plaintiff's appeals to higher levels within the prison administration to reverse the sanction imposed are unsuccessful. There appear to be very few in which a prisoner who was successful at the administrative level still sought damages for what happened to him between the leveling of the charge and its ultimate dismissal after administrative appeal.

### Factual Background

Apparently motivated by concerns that contraband was illegally entering Bayside, its internal affairs department conducted an undercover operation to determine the source of the contraband. Defendant Lonergan was involved in this investigation during which he spoke on a confidential basis to two prisoners who identified plaintiff having possessed an 8½ inch lock blade knife. Quite remarkably one of the informants actually turned over the knife in question to prison authorities.

Plaintiff was charged with violating N.J.A.C. 10A:4–4.1(a)(*.202)—possession or introduction of a gun, firearm, weapon, sharpened instrument, knife or unauthorized tool.[4] Prison officials invoked the disciplinary procedures set forth in N.J.A.C.:4–9.1 *et seq.*, and, after several postponements, a hearing took place on January 15, 1992.

Lonergan prepared written reports of his conversations with the two informants, but neither the names of the informants nor these reports were ever turned over to the plaintiff. The hearing officer, defendant Joseph A. Knowles, did review the Lonergan reports,[5] but never actually spoke with the informants. Thus, the only "evidence" at plaintiff's disciplinary hearing was a photograph of the offending knife and Knowles' *in camera* evaluation of Lonergan's reports.

---

1. On February 3, 1992, plaintiff was transferred to New Jersey State Prison and sometime after June 12, 1992, he was transferred again to Southern State Correctional Facility.

2. The named defendants are E. Calvin Neubert, the Administrator of Bayside; R.F. Lonergan, Jr., an internal affairs investigator at the prison; and Joseph A. Knowles, a hearing officer in the Inmate Disciplinary Program at Bayside.

3. In their moving papers the defendant urged the court to grant summary judgment on the basis that the disciplinary hearing complied in all respects with constitutional mandates.

4. The regulation indicates that the asterisk is used to designate those offenses considered "most serious."

5. At the court's request Lonergan's reports of his conversations with the confidential informants were filed under seal with the court and have been reviewed by the court.

Although N.J.A.C. 10A:4–9.14(a) does provide for confrontation and cross examination when the "Disciplinary Hearing. Officer deems it necessary for an adequate presentation of the evidence, particularly when serious issues of credibility are involved," such confrontation was denied pursuant to 9.14(b) which permits the hearing officer to bar cross examination if it "would be unduly hazardous to correctional facility safety or goals."[6]

Without revealing anything which might identify the informants, it suffices to say that neither informant had a prior history of providing reliable information, and both informants had a substantial self-interest in being perceived helpful by the authorities. Although Knowles noted in his written evaluation that "the information provided cannot be verified with certainty," he found the informants to be credible because "the informants were developed independent from each other and are not believed to be associates of each other . . . [and] the focus of their information was not the same, while still being corroborative of each other."

After evaluating the confidential information Knowles concluded that plaintiff would have to "provide overwhelming evidence" to overcome the informants' accusations. As is probably not surprising, the evidence was not forthcoming. Although plaintiff was provided with a "counsel substitute" and given the opportunity to present evidence or call witnesses, he did neither and was found guilty.[7]

Plaintiff was found guilty as charged and sanctioned with fifteen days of disciplinary detention, three hundred sixty-five days administrative segregation and three hundred thirty days of lost commutation time. N.J.A.C. 10A:4–5.1(a); N.J.A.C. 10A:4–10.1 et seq.; and N.J.A.C. 10A:5–3.1 et seq.

Following the procedure set forth in N.J.A.C. 10A:4–11.1 et seq., plaintiff appealed the finding of guilt and sanction to the superintendent of Bayside, defendant E. Calvin Neubert. This appeal was promptly denied.

Although the regulations do not specifically provide for a further administrative appeal, plaintiff wrote to Commissioner of Corrections, William H. Fauver, on May 16, 1992, protesting the result of the disciplinary proceedings. Something in the letter attracted Fauver's attention because on June 5, 1992, plaintiff was contacted by a prison official who arranged a polygraph test four days later. The outcome of this test apparently convinced officials that there was insufficient proof of plaintiff's guilt and the sanctions imposed at the disciplinary hearing were reversed, the records of the infraction were expunged from his file and plaintiff was released from administrative segregation.[8]

### Disciplinary Due Process

■ In Wolff v. McDonnell the court considered whether a prisoner who faced the possible loss of good time credits in a disciplinary proceeding had a constitutionally protected liberty interest which would impose procedural due process requirements on the conduct of that hearing. The answer was yes:

But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process

6. Although the record is not totally clear, it also appears that plaintiff was not permitted to cross examine defendant Lonergan concerning his confidential conversations with the secret informants.

7. It is not easy to imagine exactly what evidence plaintiff could have adduced, not knowing the names of the informants, the contents of their statements or even the circumstances under which the knife was found. This situation presents the classic difficulty of trying to prove a negative proposition.

8. The use of polygraphs to investigate disciplinary charges is specifically sanctioned by N.J.A.C. 10A:3–7.1. There does not appear to be any constitutional infirmity in using lie detectors in a prison context. See e.g., Lenea v. Lane, 882 F.2d 1171, 1174 (7th Cir.1989).

Clause to insure that the state-created right is not arbitrarily abrogated.

418 U.S. at 557, 94 S.Ct. at 2975.

Although the court in *Wolff* was only faced with a challenge to the procedures employed to deprive a prisoner of good time credits, the holding equally applies when a disciplinary proceeding results in a punitive form of confinement:

> Although the complaint put at issue the procedures employed with respect to the deprivation of good time, under the Nebraska system, the same procedures are employed where disciplinary confinement is imposed. The deprivation of good time and imposition of "solitary" confinement are reserved for instances where serious misbehavior has occurred. This appears a realistic approach, for it would be difficult for the purposes of procedural due process to distinguish between the procedures that are required where good time is forfeited and those that must be extended when solitary confinement is at issue. The latter represents a major change in the conditions of confinement and is normally imposed only when it is claimed and proved that there has been a major act of misconduct. Here, as in the case of good time, there should be minimum procedural safeguards as a hedge against arbitrary determination of the factual predicate for imposition of the sanction. 418 U.S. at 571–572 n. 19, 94 S.Ct. at 2982 n. 19.[9]

Although disciplinary proceedings need not be clothed with the full · panoply of rights afforded a defendant in a criminal trial, the court found that minimal due process required advance written notice to the prisoner of the charge against him (418 U.S. at 563, 94 S.Ct. at 2978) a written statement by the factfinder as to the evidence relied upon and the reasons for the disciplinary action taken (418 U.S. at 564, 94 S.Ct. at 2978), a limited right of the prisoner to call witnesses and present evidence (418 U.S. at 566, 94 S.Ct. at 2979), and, for illiterate inmates or in complex matters, the assistance of a fellow inmate or staff member in presenting his defense.[10]

In limiting the scope of due process rights *Wolff* recognized the unique penal environment:

> Prison disciplinary proceedings ... take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so. Some are first offenders, but many are recidivists who have repeatedly employed illegal and often very violent means to attain their ends. They may have little regard for the safety of others or their property or for the rules designed to provide an orderly and reasonably safe prison life. Although there are very many varieties of prisons with different degrees of security, we must realize that in many of them the inmates are closely supervised and their activities controlled around the clock. Guards and inmates co-exist in direct and intimate contact. Tension between them is unremitting. Frustration,

---

**9.** Whether a prisoner has a constitutional liberty interest in remaining with the general prison population under all circumstances is a more complex issue. Reasons other than punishment for a specific infraction, such as the need to maintain security, quell disturbances, protect persons or property or deal with recalcitrant or dangerous inmates, or even administrative convenience, may require removing a prisoner from the general prison population. See N.J.A.C. 10A:3–2.1 *et seq.* ("Keep Separate Status"), N.J.A.C. 10A:4–10.1 ("Confinement in Prehearing Detention") and N.J.A.C. 10A:5–1.1 *et seq.* ("Close Custody Units").

Given the broad deference which the courts accord prison officials in running their institution, not every transfer to a restrictive form of confinement would necessarily implicate due process concerns to the same extent as provided in *Wolff*. *See, e.g., Helms v. Hewitt,* 655 F.2d 487 (3d Cir.1981), rev'd in part, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), on remand, 712 F.2d 48 (3d Cir.1983); *Layton v. Beyer,* 953 F.2d 839 (3d Cir.1992); and *Gibson v. Lynch,* 652 F.2d 348 (3d Cir.1981); *compare Muhammad v. Butler,* 655 F.Supp. 1466 (D.N.J.1985), appeal dismissed, 802 F.2d 447 (3d Cir.1986) (permanent transfer to more restrictive confinement based on warning by ex-girlfriend of escape threat held to implicate due process concerns).

**10.** *Wolff,* to a limited extent, borrowed the due process requirements previously imposed for parole revocation hearings. *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) and *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973).

resentment, and despair are commonplace. Relationships among the inmates are varied and complex and perhaps subject to the unwritten code that exhorts inmates not to inform on a fellow prisoner.

418 U.S. at 561–562, 94 S.Ct. at 2977. *See also Ponte v. Real,* 471 U.S. 491, 497, 105 S.Ct. 2192, 2196, 85 L.Ed.2d 553 (1985).

In this environment *Wolff* recognized peculiar problems and severely limited a prisoners rights to confrontation and cross-examination at a disciplinary hearing. 418 U.S. at 567, 94 S.Ct. at 2980. *See also* N.J.A.C. 10A:4–9.14. And much litigation arises from this limitation. Because the perception that a prisoner has given evidence against a fellow inmate can lead to unhappy consequences, confidential informants are sometimes used to gather information about the violation of prison regulations. Not only are the identities of the informants kept secret, but much if not all of the detail of their statements are hidden lest some detail should inadvertently reveal their identity. Thus, a prisoner is sometimes faced with the daunting prospect of rebutting unknown evidence, although some details of this evidence, as was true in this case, may be known and reviewed by the disciplinary board or hearing officer.

*Helms v. Hewitt,* 655 F.2d 487 (3d Cir. 1981), *rev'd in part,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), *on remand,* 712 F.2d 48 (3d Cir.1983) involved the difficult task of mutually accommodating the due process rights of a prisoner facing disciplinary sanctions with the legitimate institutional need of prison administrators to use confidential informants and to keep their identities secret.

In the part of *Helm* unaffected by the Supreme Court decision [11] the plaintiff was charged with striking a corrections officer during a prison disturbance. The only evidence in support of the charge was presented by Lt. Kyler who related what he had allegedly been told by an unnamed informant. Kyler had obtained a sworn written statement from the informant and claimed that the informant had provided reliable corroborating evidence in the past. Neither the statement nor the information confirming the informant's reliability was made available to the prison tribunal trying Helms. *Helms,* 655 F.2d at 502.

The Third Circuit found that Helms had not received the due process mandated by *Wolff* for a disciplinary hearing:

> We believe, however, that in entrusting to prison officials responsibility for promulgating procedures for arriving at an adequate basis for decision, *Wolff* intended a genuine, even if single, factfinding hearing and not a charade. *Id.*

■ When the principal testimony against an inmate is information developed from a confidential informant, the court found that to avoid "disciplinary sanctions on the basis of trumped up charges" due process has two requirements: (1) the record must contain some factual information confirming the reliability of either the informant or his information; and (2) the record must contain the informant's statement, whether written or as reported, in language that is factual rather than conclusionary so the tribunal can determine by the statement's specificity that the informant spoke with personal knowledge. *Helms,* 655 F.2d at 502. These requirements were adopted from *Gomes v. Travisono,* 510 F.2d 537, 540 (1st Cir.1974) and are also embodied in N.J.A.C. 10A:4–9.15(b).[12] *See also Young v. Kann,* 926 F.2d 1396, 1402 (3rd Cir.1991); *Henderson v. Carlson,* 812 F.2d 874, 879–880 (3d Cir.1987); and *Kyle v. Hanberry,* 677 F.2d 1386, 1390 (11th Cir.1982)

**11.** The Supreme Court was concerned with Helm's confinement to administrative segregation *prior* to hearing the disciplinary charges against him. 459 U.S. at 473, 103 S.Ct. at 872 and 712 F.2d at 49.

**12.** One court has suggested that the *Gomes* procedures related to a "substantial evidence" standard and were perhaps inconsistent with the "some evidence" standard set forth in *Superin-*

*tendent, Massachusetts Correctional Institution at Walpole v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). *Baker v. Lyles,* 904 F.2d 925, 931 (4th Cir.1990). We note that *Young v. Kann,* 926 F.2d at 1402 reaffirmed the vitality of *Helms* six years after *Hill* was decided. Interestingly, N.J.A.C. 10A:4–9.15(a) provides that "guilt at a disciplinary hearing shall be based upon substantial evidence."

("Without a bona fide evaluation of the credibility and reliability of the evidence presented, a prison committee's hearing would be reduced to a sham which would improperly subject an inmate accused of wrongdoing to an arbitrary determination.")

■ When measured against this standard, the defendants would not be entitled to summary judgment on plaintiff Hyson's complaint. While the existence of two unrelated informants might arguably constitute an independent confirmation of reliability, the absence of past indicia of reliability or extrinsic evidence supporting their stories is troubling. And the other requirement of *Helms* has clearly not been met. Lonergan's reports, insofar as they deal with Hyson, set forth the informants' stories in completely conclusory terms, and outside Lonergan's recounting of this story, the record reflects no independent corroboration of the knife possession charge.[13]

## Effect of Successful Administrative Remedy

■ If plaintiff were still in administrative detention and the sanction originally imposed still in force, defendants' motion for summary judgment would be denied and the case would proceed to trial. What makes this case somewhat unique is that plaintiff was successful in getting an administrative reversal of the original determination of guilt. Moreover, he succeeded, not through the appeal mechanism provided in the regulations, but by a direct appeal to the Commissioner of Corrections as the chief executive officer of the entire New Jersey prison system. *See* N.J.A.C. 10A:1–2.3.

Because few disciplinary cases get to court when the prisoner has administratively prevailed, there is not a lot of authority discussing whether a successful administrative appeal satisfies due process and immunizes prison officials from damages for any harm

the prisoner may have sustained between the original hearing date and the date on which the guilty finding is reversed.

A few cases have assumed this result without much discussion. In *Thomas v. Zelez*, 731 F.Supp. 1462 (D.Kan.1990) a hearing before a Custody Review Board ("CRB") resulted in plaintiff's incarceration in the maximum security wing. Defendants conceded that the CRB was improperly composed, but plaintiff's claim for damages was rejected:

> Defendants concede that the CRB was improperly composed. The record shows that the decision of that body was nullified in May 1987, and all pertinent records were removed from plaintiff's file. The court finds that this action adequately cured any defects in the CRB proceeding and concludes that no claim is stated.

731 F.Supp. at 1465.

Similarly, in *Vega v. DeRobertis*, 598 F.Supp. 501 (N.D.Ill.1984) *aff'd without opinion Vega v. DeRobertis*, 774 F.2d 1167 (7th Cir.1985), the court found that "[a]ny doubts this Court might have about the constitutional adequacy of the AC's [Adjustment Committee] findings in any instance are altogether dispelled by the fact that any potential deficiencies were put right in the normal course of administrative review." *Id.* at 505.

■ Where a state's prison administration has in place reasonable provisions for administratively appealing initial determinations of guilt at a disciplinary hearing, due process requires only that the proceedings viewed as a whole not lead to a constitutionally tainted result. Indeed, this view is statutorily supported by the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 *et seq.*, which contains, in § 1997e, a limited exhaustion of remedies obligation on a prisoner seeking to invoke § 1983.[14]

---

13. The court has considered whether defendants would be entitled to qualified immunity under the rule of *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). It appears that the due process rights for disciplinary hearings articulated by the Third Circuit in *Helms v. Hewitt* should be well known to a prison official such that qualified immunity would not be available. *See, Sourbeer v. Robinson*, 791 F.2d 1094, 1103 and 1108–10 (dissent of Judge Weis)

(3d Cir.1986) *cert. den. Patton v. Sourbeer*, 483 U.S. 1032, 107 S.Ct. 3276, 97 L.Ed.2d 779 (1987).

14. A prisoner's obligation to exhaust administrative remedies exists only if the administrative remedies are "plain, speedy and effective." 42 U.S.C. § 1997e(a)(1). Before a court can impose an exhaustion requirement it, or the Attorney General, must determine that the state's proce-

If New Jersey regulations provided for a prompt appeal to the Corrections Commissioner from an adverse determination on an initial appeal to the prison superintendent, there would be little doubt that defendants would be entitled to summary judgment. However, there does not appear to be any administrative regulation permitting such further level of appeal, and were the state seeking to compel plaintiff to exhaust administrative remedies under § 1997e, such an effort would fail.

■ Nevertheless, where prison officials rectify the consequences of a constitutionally deficient disciplinary hearing within a reasonable time, even absent a specific regulatory appeal procedure, the mandates of due process have been satisfied. There is simply no logical reason why conduct by state officials consistent with the dictates of due process should be deemed ineffective solely because such conduct was not taken pursuant to a specific regulation.

■ Whether a particular time frame is reasonable must be decided on a case by case basis. In making such determination a court should consider both the length of time which passed before the defects in the initial proceedings were corrected and the seriousness of the punishment inflicted in the interim.

In this case the court finds that the due process was not violated because it took from January 15 until June 12, 1992, to reverse the hearing officer's original decision, particularly where the primary harm sustained by plaintiff was confinement to administrative segregation. While the court does not wish to minimize the impact on the inmate of being placed in this kind of confinement, as noted by the Supreme Court in *Hewitt v. Helms,* "administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." 459 U.S. at 468, 103 S.Ct. at 870.

For the reasons set forth above defendants' motion for summary judgment will be

granted, and the Court will enter an order in conformance with this opinion.

dures meet the standards promulgated in 28 C.F.R. § 40.1 *et seq.* 42 U.S.C. §§ 1997e(a)(2) and (b). Although the provisions of N.J.A.C. 10A:4–11.1 *et seq.* would appear to meet these requirements, we are not aware that any court or the Attorney General has so ruled.